UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAR 15 P 1:52

U.S. DISTRICT COURT
BRIDGEPORT, CONN

PAUL LOWE AND NADINE             :      3:00CV437(AHN)
CARTWRIGHT-LOWE, P/P/A           :
PAUL LOWE, JR.,                  :
        Plaintiffs,              :
                                 :
v.                               :
                                 :
CITY OF SHELTON, BOARD OF        :
EDUCATION, SHELTON HIGH          :
SCHOOL, DONALD RAMIA, BETH       :
SMITH, AND DEBORAH KELLER,       :
        Defendants.              :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Paul Lowe, Jr. ("Paul"), and his parents, Drs. Paul Lowe and Nadine Cartwright-Lowe ("the Lowes"), commenced this action alleging that defendants City of Shelton, Board of Education, Shelton High School, Donald Ramia, Beth Smith, and Deborah Keller violated his constitutional and statutory rights by denying Paul permission to form a jazz club at Shelton High School ("SHS"). Defendants now move for summary judgment on all counts of plaintiffs' complaint against them. For the reasons discussed below, defendants' motion [Dkt. #20] is GRANTED.

### FACTS

The court makes the following factual findings based on the parties' submissions. During the 1998-99 scholastic year, Paul was an eighth-grader in Shelton's public school system. Paul played the saxophone and was a member of the intermediate school band. He also participated in SHS's jazz band, which assembled every year on an ad hoc basis after football season ended.

In the spring of 1999, while Paul was still in eighth grade, he and his parents met with SHS principal, Donald Ramia, and music instructor, Deborah Keller, to discuss Paul's participation in the high school band as an incoming freshman. SHS had a longstanding policy that students wishing to participate in the school band had to take a band course for at least their first year. The Lowes, however, did not feel that Paul needed formal music instruction and preferred that his course work be devoted to academics. Consequently, they asked Ramia and Keller to except Paul from SHS's longstanding requirement. Ramia and Keller agreed so long as Paul enrolled in band as an independent study, attended annual band camps in August, and participated in practices and performances.

That summer, in June 1999, the Lowes attended a meeting for parents of new SHS band members. At the meeting, they were informed that as a band member Paul would be required to participate in fundraising efforts. However, the Lowes were concerned that the fundraising would interfere with Paul's academic studies and immediately sent a letter to Ramia stating, in effect, that Paul would not be part of the SHS band after all. That August, Paul did not attend band camp as agreed. When school began that fall, Paul officially informed Keller that he would not be playing in the band.

Subsequently, Paul approached Ramia about forming a jazz club. Ramia told Paul that in order to establish a club, Paul

would need to obtain at least one faculty advisor, and submit a proposal and a constitution for review by the student council. Paul first approached Keller about being an advisor to the club, but she declined, stating that she did not have time. Paul then approached Ramia, but he declined as well because as SHS's principal he did not want to set a precedent of serving as an advisor. Paul eventually secured Robert Darby, a new faculty member at SHS, and Joanne Desrochers, another faculty member who had a background in folk music. Paul also drafted and submitted both a proposal and a constitution for the club to the student council.

While waiting for the student council to act, several events took place that now form the basis of the plaintiffs' lawsuit. First, Paul invited a friend who was an upperclassman, John Blank, to join the proposed jazz club. John accepted and the two began canvassing other SHS students about joining. Interested students were asked to provide information on a sign-up sheet, giving their name, address, instrument, and jazz experience. Paul and John determined whether a student was qualified to join the club based on the experience stated. A small group of students signed up, and from that group, Paul and John determined that two did not have the right kind of experience. Thus, they were denied membership.

Second, Paul and John performed at an SHS function called "Back to School Night." The function was held in the school's

media room. At some point in the evening, Paul left to retrieve a piano from the music room. During Paul's absence, Keller, who was also in attendance, remarked, "Who does he think he is?" John heard the comment and later relayed it to Paul, speculating that Keller was not pleased that they were forming a jazz club. Paul later informed his parents about Keller's statement.

Third, on October 8, 1999, Paul and a group of other students who were interested in joining the jazz club met in SHS's music room for a practice session. The session was interrupted by the student council, which coincidentally, was convening in that room to review Paul's proposal and constitution for the club. Paul and his group were asked to leave the room, and they did. In the meeting that followed, the student council expressed several concerns about approving the jazz club; in particular, the students who had been denied membership.

Later, Keller and other faculty members questioned why Paul held the October 8 meeting when the student council had not yet approved the jazz club. There was also some speculation that Paul had lied about reserving the music room because Keller claimed that she had not given him permission to use it. As a result, both Darby and Desrochers resigned as club advisors. Also, Beth Smith, one of the faculty advisors to the student council, approached Paul and told him that the jazz club should not hold any more meetings because it had not yet been approved, and that the student council was unlikely to approve the club

because it had several concerns. Paul informed his parents about the encounter with Smith, and the Lowes met with Ramia the following day.

The Lowes told Ramia that they suspected Smith was urging the student council to reject the jazz club. They also informed Ramia of Keller's remark at the "Back to School Night" function, which, to their surprise, Ramia was already aware of. Ramia told the Lowes that, in his opinion, Keller felt intimidated by Paul's musical talent and that he would speak to her about making such remarks. He also stated that he was unsure why there should be any objection to the jazz club having membership requirements when some of the other clubs at SHS also imposed various criteria for joining.

On October 22, 1999, the student council reconvened and voted unanimously to reject Paul's proposal for a jazz club. Apart from substantive concerns, the council found that because both Darby and Desrochers had resigned, the club did not have the required faculty advisor.

A few days later, Ramia sent a letter to the Lowes informing them about the rejection. The letter stated, in pertinent part, that (1) the club's membership qualifications were too restrictive and therefore limited the possible number of members; (2) it was uncertain who would be judging the qualifications of club members; (3) the club duplicated SHS's already existing jazz band; (4) the club interfered with the SHS band because it was a

performance-based club; (5) the club's advisors had resigned because the faculty believed that Paul had lied about reserving the music room on a prior occasion. Afterwards, it came to Ramia's attention that there had been a miscommunication about reserving the music room, and that Paul had not lied about it. Still, the jazz club was left unapproved.

On November 2, 1999, the Lowes served defendants with notice of their intent to sue. In March 2000, the Lowes filed this action, seeking compensatory and punitive damages, formation of the proposed jazz club, and a public apology.

## Discussion

Although the court presumes that Paul is no longer a student at SHS, plaintiffs' action is not moot because they seek both compensatory and punitive damages as well as a public apology. However, since plaintiffs do not claim that there are current students at SHS who are interested in forming a jazz club, that remedy is plainly foreclosed. Because the parties do not genuinely dispute any of the pertinent facts -- only their legal significance -- summary judgment review is proper.

A.  <u>Summary Judgment Standard</u>

Summary judgment will be granted if the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 36 (2d Cir. 1994); Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only

if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the nonmovant. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), and all ambiguities and inferences that may reasonably be drawn from the facts must be viewed in the light most favorable to the nonmoving party, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

Where, as here, the nonmovant bears the burden of proof at trial, the movant can satisfy its burden of production by pointing to an absence of evidence to support an essential element of the nonmovant's case. <u>See</u> <u>Ginsberg v. Healey Car & Truck Leasing, Inc.</u>, 189 F.3d 268, 270 (2d Cir. 1999) (citing cases).

B. <u>Plaintiffs' Statutory Claims</u>

The court begins with plaintiffs' statutory claims, <u>see</u> <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985) (stating that federal courts must consider nonconstitutional grounds for a decision before reaching constitutional ones), that, by virtue of the student council's decision, defendants violated Paul's rights under the Equal Access Act, 20 U.S.C. §§ 4071 - 4074, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

1. Equal Access Claim

Under the Equal Access Act, a public secondary school with a "limited open forum" [a term of art that arises under the Act and that is distinct from a First Amendment "limited public forum," see Board of Ed. of Westside Comm. Schools v. Mergens, 496 U.S. 226, 242 (1990)] cannot discriminate against students wanting to meet within that forum on the basis of "religious, political, philosophical, or other content of the speech at such meetings." Specifically, the Act provides:

> "It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, or other content of the speech at such meetings."

In this case, the parties do not dispute that SHS is a public secondary school and that it receives federal funds. Rather, the plaintiffs' claim turns on whether SHS has a "limited open forum," and if so, whether the defendants, by virtue of the student council's decision, improperly denied Paul equal access to that forum on the basis of the speech that would have taken place at the jazz club's meetings.

   a. "Limited Open Forum"

Under the Act, a "limited open forum" exists when a secondary public school allows one or more noncurriculum-related student groups to meet on school premises during noninstructional

time. See 20 U.S.C. § 4071(b). A school becomes such a forum even if it allows only one noncurriculum student group to meet. See Mergens, 496 U.S. at 236. The Supreme Court has interpreted a noncurriculum student group to be any student group that does not directly relate to the body of courses offered by the pertinent school. See id. at 239. In other words, the subject matter of the group is not taught in any regularly offered course, does not concern the body of the school's courses as a whole, and is neither a requirement for a particular course nor results in academic credit. See id. at 240 (reasoning that unless a school can show that groups such as a chess club, a stamp-collecting club, or a community service club fall within the description of groups that directly relate to its curriculum, the existence of such groups creates a "limited open forum" and thereby prohibits the school from denying equal access to any group on the basis of the content of that group's speech).

Here, the record indicates that, at least during the 1999-2000 school year, SHS allowed various noncurriculum-related student groups to meet on its premises during noninstructional time. For example, a number of community service clubs existed at SHS, including "Habitat for Humanity" (whose stated aim was to "[d]onate time and labor to help families), "Interact Club" (which worked "in conjunction with the Shelton-Derby Rotary"), and "Make-A-Difference Club" (which provided volunteers and resources to various community projects). See Pl. Obj. to Def.

Mot. for S.J., Exh. 5. Under Mergens, the existence of these kind of clubs at SHS clearly created a "limited open forum" within the meaning of the Act.

      b.  Content of the Speech

Having found that SHS maintained a "limited open forum" (at least during the 1999-2000 academic year at issue here), the court must determine whether the student council improperly rejected the jazz club by basing its decision on the content of the speech that would have taken place at the club's meetings. The court finds no basis for that conclusion.

Specifically, there is no evidence from which a reasonable finder of fact could conclude that the proposed jazz club was rejected on the basis of the religious, political, or other content of the speech at such meetings. The record reflects only that the student council rejected Paul's proposal on technical grounds, -- principally because the club lacked a faculty advisor, its membership criteria was too restrictive, and it duplicated other SHS organizations that already existed -- not on the basis of its content. Thus, having failed to raise any factual dispute which would suggest that the club was rejected in contravention of the Act, the court finds that plaintiffs have failed to meet their burden here. Consequently, summary judgment on this issue must be granted in favor of the defendants.

2.  Title VI Claim

Plaintiffs also allege that the student council rejected the proposed jazz club because of Paul's race, thereby discriminating against him in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[1] Title VI prohibits institutions that receive federal funding, such as SHS, from intentionally discriminating on the basis of race. Thus, proof of a racially discriminatory intent or purpose is required in order to sustain a Title VI claim. See Alexander v. Sandoval, 121 S.Ct. 1511, 1522 (2001). Plaintiffs must show that the alleged discriminatory purpose was a motivating factor in the decision, but not necessarily the only factor. See Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977).

Here, plaintiffs fail to show that racial discrimination was a factor at all. Plaintiffs argue that race was a motivating factor in the student council's decision to reject Paul's proposal for a jazz club because, in their opinion, Ramia's October 1999 letter was invalid and untrue. However, apart from this bald assertion, plaintiffs have failed to provide any evidence from which a reasonable finder of fact could infer that

---

[1] Plaintiffs have also pleaded 34 C.F.R. § 100.3, the implementing regulations for Title VI, as an independent cause of action. However, other than to merely cite the regulations, plaintiffs have not specifically alleged any claim under them, e.g., disparate impact. Nonetheless, to the extent that plaintiffs raise a disparate impact claim, it is denied because no private right of action exists to enforce such a claim. See Alexander, 121 S.Ct. at 1522-23.

the reasons given in Ramia's letter were merely pretextual, and that in fact the club was rejected for reasons pertaining to race. See Texas Dept. Of Comm. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

Moreover, the court rejects plaintiffs' contention that a fact finder could reasonably infer discriminatory intent from Keller's "[w]ho does he think he is?" remark and Smith's statement that the jazz club would not likely be approved. At best, these statements reveal that the decision to reject the jazz club may have been motivated -- at least to some extent -- by high school politics. At any rate, neither statement suggests, in any rational sense, that defendants intentionally discriminated against Paul on the basis of race. Despite their obvious disappointment, plaintiffs have not submitted any other evidence which remotely suggests that race played a factor in the student council's decision to reject the formation of the jazz club, i.e., plaintiffs have failed to allege any factual dispute that supports a prima facie case of intentional racial discrimination. Having failed to demonstrate any fact that would render such an inference reasonably permissible, summary judgment on this issue must be granted to the defendants.

C. Plaintiffs' Constitutional Claims

Having granted summary judgment in favor of the defendants as to plaintiffs' statutory claims, the court now analyzes plaintiffs' constitutional claims. Plaintiffs argue that the

student council's rejection of Paul's proposal for a jazz club violated both his First Amendment right to free speech as well as his Fourteenth Amendment right to due process. However, the court finds that neither claim can withstand defendants' present motion for summary judgment.

1. <u>Free Speech Claim</u>

Plaintiffs have failed to demonstrate any factual basis that could support their First Amendment free speech claim. Namely, plaintiffs have not offered any argument as to the kind of forum that existed at SHS during the 1999-2000 school year in question here. See <u>Fighting Finest, Inc. v. Bratton</u>, 95 F.3d 224, 228-31 (2d Cir. 1996) (identifying the nature of the forum as a threshold factor in freedom of speech claims) (citing cases).

The court's finding, supra, that SHS created a "limited open forum," for purposes of the Equal Access Act, cannot be applied to plaintiffs' constitutional claim, since, as already explained, a "limited open forum" is a statutory term that arises only under the Act. At most, a reasonable finder of fact could conclude that, for First Amendment purposes, SHS was a "limited public forum." See <u>Bronx Household of Faith v. Community School District No. 10</u>, 127 F.3d 207, 211-12 (2d Cir. 1997) (explaining the three types of forums recognized by the Supreme Court). Still, plaintiffs have not alleged any fact or set forth any evidence that suggests, with any measure of plausibility, that

Paul's proposal for a jazz club was rejected based on a certain viewpoint that the club held or would have held. See id. at 213 (reiterating the distinction between subject matter discrimination, which is permissible for purposes of a limited public forum, and viewpoint discrimination, which is not permissible if directed against speech within the limitations of that forum) (citing cases). Therefore, defendants' motion for summary judgment on the free speech issue must be granted against the plaintiffs.

    2.  Due Process Claim

Plaintiffs have similarly failed to demonstrate any factual basis to support their Fourteenth Amendment due process claim. While the Fourteenth Amendment does prohibit state action which deprives a person of a property right without the requisite due process, the plaintiffs fail to set forth any material facts that would dispute defendants' contention that Paul did not have a property interest in the proposed jazz club to begin with. While, under state law, Paul presumably held a legitimate claim of entitlement to a public education, see Mazevski v. Horseheads Cent. School Dist., 950 F.Supp. 69, 72 (W.D.N.Y. 1997), that interest cannot be dissected to create a separate interest in a particular class, team, or club. See id. As the court in Mazevski reasoned, "[i]f the rule were otherwise, every disgruntled student (or, more likely, disgruntled parent) who believed she should not have been dropped from the pep squad, or

14

who believed he should not have been benched for missing a team meeting, or who challenged his failure to be selected to take advance placement courses, could commence an action in federal court to challenge the decision of the school's administrators. This should not be. Discomfiture over such school-yard decisions does not warrant relief in federal court. To hold otherwise, is contrary to sound legal reasoning, invites disruption of the educational process and has scant pedological value." Id. at 73. Thus, having failed to raise any factual dispute as to defendants' arguement that Paul did not have a property interest in the proposed jazz club, plaintiffs due process claim must be denied in favor of the defendants.

D. Plaintiffs' Pendent State Law Claim

Plaintiffs make some intimation of also bringing an intentional infliction of emotional distress ("IIED") claim, by stating that the student council's rejection of Paul's proposal for a jazz club, as well as Ramia's letter, was extreme and outrageous conduct and that Paul suffered mental, physical, and emotional harm as a result. The evidence in the record, however, cuts against plaintiffs' argument that defendants' conduct was egregious, see Zoldak v. Tacala, Inc., 2000 WL 1576419, at *7 (D. Conn. 2000), or that Paul suffered any harm as a result. At best, plaintiffs' complaint states only that defendants' denial of the jazz club was unjustified. See id.

15

As to harm, the deposition testimonies of both Paul and his mother show that Paul's *term* grades remained the same during the period at issue. Also, Paul went on to form a jazz band outside of SHS with his siblings and some friends. Thus, to the extent that plaintiffs have sought to make an IIED claim, the court finds that they fail to allege any fact that withstands defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [Dkt. #20.] is GRANTED.

So ordered this 12 day of March, 2004, at Bridgeport, Connecticut.

Alan H. Nevas
Senior United States District Judge